# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-01830-SCT

*LEAH FULTON DOOLEY; KATHRYN MARIE
FULTON, A MINOR, BY AND THROUGH HER
MOTHER AND NEXT FRIEND, LEAH FULTON
DOOLEY; PEYTON DOOLEY, A MINOR, BY AND
THROUGH HIS MOTHER AND NEXT FRIEND,
LEAH FULTON DOOLEY; AND ALL HEIRS-AT-
LAW OF JONATHAN WAYNE DOOLEY, A
MINOR, DECEASED; DEWEY DOOLEY; AND
KAITLYN DOOLEY, BY AND THROUGH HER
MOTHER AND NEXT FRIEND, KERI PATRICK*

*v.*

*CEDRIC BYRD AND INDEPENDENT ROOFING
SYSTEMS, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/22/2009 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM W. FULGHAM |
| | DON H. EVANS |
| | JAMES W. SMITH, JR. |
| | ERIN S. RODGERS |
| ATTORNEYS FOR APPELLEES: | JAMES D. HOLLAND |
| | ANDREW J. STUBBS |
| | GEORGE MARTIN STREET, JR. |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 06/16/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     This case involves a wrongful-death action against Independent Roofing Systems,

Inc., and Cedric Byrd for Jonathan Dooley's death. Byrd, an Independent Roofing employee,

attempted to drive his truck and trailer into the driveway of a house located on Highway 468 in Rankin County, Mississippi. Byrd misjudged the turn. As a result, he left part of his trailer on the road for a short period of time. The Chevy Malibu in which Jonathan traveled with his mother collided with the trailer. Jonathan died instantly.

¶2.     Leah Dooley, Jonathan's mother, filed this wrongful-death action against Byrd and Independent Roofing on behalf of Jonathan's wrongful-death heirs. The jury returned a unanimous defense verdict. The trial court denied the heirs' post-trial motions, and they appealed. Because the trial court denied two heirs the right to participate fully in the trial and improperly instructed the jury, we reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

¶3.     Cedric Byrd worked for Independent Roofing under Ike McLain's supervision. During the early afternoon of September 29, 2003, McLain directed Byrd to pick up a piece of equipment from the home of Robert Smith, another Independent Roofing employee. Byrd left Independent Roofing's office in a flat-bed truck, pulling a twenty-nine-foot trailer, eventually traveling southwest on Highway 468 toward Smith's home. Not long after Byrd passed, Leah Dooley strapped two-year-old Jonathan into his car seat and began her trip, also southwest on Highway 468. En route, Jonathan climbed out of his car seat and into the front passenger seat. Around 2:35 p.m., as Byrd was attempting to turn into Smith's driveway, the passenger side of Leah's car collided with the left rear corner of his trailer, which was protruding approximately 5.5 feet into the southbound lane. Jonathan died instantly. Leah was not injured.

2

¶4.    Leah hired Attorney Don H. Evans to file a wrongful-death suit on behalf of Jonathan's heirs against Byrd and Independent Roofing. Jonathan left five wrongful-death heirs: Leah (mother), Dewey (father), Kaitlyn (half-sister), Kathryn (half-sister), and Peyton (brother). Eventually, Attorney William W. Fulgham filed a Motion for Joinder and Separate Representation on behalf of Dewey and Kaitlyn. The court granted the motion. Afterward, Evans and co-counsel James W. Smith Jr. represented Leah, Kathryn, and Peyton (collectively "Leah"). Fulgham and co-counsel Erin S. Rogers represented Dewey and Kaitlyn (collectively "Dewey").

*Leah's version of the accident*

¶5.    The plaintiffs had alternative two theories of liability: (1) that Byrd had backed into Leah's car, or (2) that Byrd had left his trailer in the road without warning the southbound traffic.

¶6.    Leah testified that, on the day of the accident, she had placed Jonathan's car seat on the left rear seat of her car, immediately behind the driver. Before leaving from her home, she had secured Jonathan in his car seat and had driven southwest on Highway 468 in Rankin County.

¶7.    Leah estimated that she had been traveling from forty-five to fifty-five miles per hour, as she approached the scene. Her expert determined that her speed had been fifty-five miles per hour just before the accident.[1] Halfway to the accident scene, Jonathan climbed out of his car seat and into the front passenger's seat. Leah never reduced her speed.

---

[1]The plaintiffs tendered Tim Corbitt as an expert in crash data retrieval. After analyzing the "black box" from Leah's car, Corbitt determined that, five seconds before the accident, Leah's speed had been fifty-five miles per hour.

3

¶8. Leah described the part of Highway 468 leading to the scene as a "straight shot," with a clear view for about one mile. She explained that the truck and trailer had not been in the road as she had approached the scene. Leah had noticed Byrd's trailer on the side of the road, but because of the shade along the highway, she could not see the trailer clearly. As she continued south, the trailer suddenly backed into the road, hooked into her car, and spun it into a ditch. According to Leah, the accident happened so quickly that she did not swerve or apply her brakes. She did not recall speaking with Byrd after the accident.

¶9. McLain, the Independent Roofing employee who supervised both Byrd and Keys, also testified for the plaintiffs.[2] After learning of the wreck, McLain traveled to the scene. When he arrived, McLain saw grass and gravel spent around the truck's front-pull axle, which indicated to him that the truck had been backing up. McLain pointed out the spent gravel to Independent Roofing safety director Russell Ramsey and offered his opinion of its significance. But, allegedly, Ramsey dismissed McLain's concerns. Ultimately, McLain found it "obvious" that the truck had been backing up, but said that "everyone" had wanted to "cover it up."

¶10. The plaintiffs called Rankin County Sheriff's Department Deputy Don Bryant and Sergeant Dan Warren as witnesses. Officer Bryant had driven upon the scene right after the accident. Deputy Bryant testified that the rear tires of Byrd's truck looked like they had been spinning. Deputy Bryant believed that Byrd had attempted to back his truck up the incline in the driveway, but that the truck had gotten stuck.

---

[2]McLain was no longer employed at Independent Roofing at the time of the trial.

4

¶11.	Sergeant Warren testified that when he arrived at the scene, he could see the truck clearly. But because of the shadows, he could not see the trailer very well. Based on photographs from the accident scene, Sergeant Warren testified that the tires from Byrd's truck had been spinning from Byrd's attempts to back up or pull forward.

*Byrd's version of the accident*

¶12.	The defendants contended that Leah had rear-ended Byrd while he was completing his turn.

¶13.	According to Byrd, he had followed fellow employee Patrick Keys to Smith's home to pick up a piece of equipment. In turning into a driveway leading to Smith's home, Byrd did not turn widely enough to the left to complete the right turn. As he attempted the turn, he went partially off the left side of the driveway; consequently, his left front wheel went into a ditch. Byrd stalled in this position, which left the left rear part of his trailer protruding in the road approximately five and a half feet. According to Byrd, he tried unsuccessfully to drive the truck and trailer in reverse to avoid hitting Smith's mailbox.

¶14.	Byrd explained that Keys already had parked and had walked toward Byrd's stalled truck and trailer. Byrd testified that he asked Keys to check Smith's mailbox to make sure that he would not hit it as he made the turn. According to Byrd, Keys walked toward the road, and in the process of checking the mailbox, he directed three cars to pass Byrd. Byrd testified that Keys returned to the front of Byrd's truck and was guiding him into the driveway to ensure that he did not hit the mailbox. The accident happened about thirty seconds after Byrd began moving forward. Byrd testified that, after the accident, Leah

5

approached him and said that she had not seen the trailer because she had been picking up Jonathan from the passenger's side floorboard.

¶15. Keys provided a similar description of the events. According to Keys, Byrd had no reason to back up, and he did not recall whether Byrd attempted to back up. Keys did recall that two to three cars had passed before the accident, but he denied that he had directed the cars to pass around the trailer. According to Keys, he had watched the cars pass when he had walked to the truck's rear-passenger-side tires to check the mailbox. He denied that he had walked behind Byrd's trailer.

¶16. The jury unanimously found that Byrd and Independent Roofing were not liable. The trial court denied Leah's and Dewey's alternative motions for a judgment notwithstanding the verdict (JNOV) or a new trial, and they appealed.

## ISSUES

¶17. Leah and Dewey assert the following issues, which we rephrase for clarity:

    **I.**    **Whether the lower court abused its discretion by granting Dewey's joinder motion and in handling Dewey's request for separate representation.**

    **II.**    **Whether the lower court erred in refusing proposed jury instructions P-21, P-36, P-40, P-44A, and P-44B and in granting jury instruction numbers 7, 10, and 11.**

    **III.**    **Whether the verdict was against the overwhelming weight of the evidence.**

    **IV.**    **Whether the lower court erred in failing to grant Leah's and Dewey's Motions for Judgment Notwithstanding the Verdict.**

We limit our review to the first two issues. *See* M.R.A.P. 17.

## DISCUSSION

6

## I.     Motion for Joinder and Separate Representation

### A.     Joinder

¶18.    Leah contends that the trial court erred in granting Dewey's motion for joinder. Evans, who represented Leah (mother), Kathryn (half-sister), and Peyton (brother) (collectively "Leah"), filed this suit on behalf of all of Jonathan's wrongful-death heirs. Approximately one and a half years later, Fulgham filed a Motion for Joinder and Separate Representation on behalf of Dewey (father) and Kaitlyn (half-sister) (collectively "Dewey"), citing **Long v. McKinney**, 897 So. 2d 160 (Miss. 2004), as authority.  In response, Leah urged the trial court to deny Dewey's request and argued the following points, which we rephrase:

- Dewey had repeatedly blamed Leah for the accident.
- Dewey's current wife, "the same person [whom] he left and abandoned Leah . . . and their children for," attempted to have Leah indicted.
- Dewey had assisted Byrd and Independent Roofing's attorneys in defending the claim.
- Dewey repeatedly had contended that Jonathan had died because Leah did not have him in his car seat.
- Dewey only wanted to join the case "to get inside information" for Byrd and Independent Roofing's attorneys.
- Dewey did not qualify as an heir under the statute because he had abandoned his children and was more than $6,000 behind in alimony and child-support payments.
- Dewey had brought his girlfriend, "who he . . . deserted his family for," to Jonathan's visitation and funeral, which showed "total disrespect" for Leah and their deceased son.
- Kaitlyn did not qualify as a wrongful-death beneficiary, as there was no proof that she was Dewey's daughter.[3]

---

[3]The responses to Dewey's motion for joinder resurfaced during Leah's cross-examination. The defendants' counsel cross-examined her extensively on the responses and entered the document into evidence.

Later, Leah filed an amended response with the same arguments for denial. The amended response included a copy of Leah's letters of appointment from the chancery court and further explained that she had retained Evans's law office to represent the wrongful-death heirs in this suit. The record does not indicate when, but the trial court granted the motion.

¶19. Leah asserts that she and the other heirs were prejudiced, because the jury heard the negative and inflammatory assertions she outlined in her response to Dewey's motion for joinder. Leah also contends that William Partenheimer, the expert hired by Dewey, presented a "joinder issue problem," because he testified that Leah had held some responsibility for the accident.

¶20. *Long v. McKinney* clarified the procedural rules governing wrongful-death claims. *Long v. McKinney*, 897 So. 2d 160, 171 (Miss. 2004) ("The resolution of this case requires only that we address appropriate practice and procedure in wrongful death litigation. No substantive law is involved."). The Court held, in relevant part, that all wrongful-death claims must be litigated in one suit. *Id.* at 174; *see also Smith v. Holmes*, 921 So. 2d 283, 286 (Miss. 2005) ("[I]f a wrongful death beneficiary wishes to join a wrongful death lawsuit, his motion to join should be granted . . . .").

¶21. Here, the trial court properly granted Dewey's joinder motion. Not only was the trial court's decision correct, but *Long* and the wrongful-death statute also mandated that outcome. *See* Miss. Code Ann. § 11-7-13 (Rev. 2009); *Long*, 897 So. 2d at 174.

¶22. The remaining "joinder issue problems" argued by Leah also lack merit. Although Leah objects to Partenheimer's participation as an expert witness to argue against joinder, she relied on his opinion throughout her briefs to support her other arguments. In light of

*Long*, we also must reject her argument that the trial court's disposition of the joinder motion somehow could have prevented the jury from hearing the inflammatory information included in her response to Dewey's joinder motion.

    *B.    Separate Representation*

¶23.    Dewey relies on *Long* and *River Region Medical Corp. v. Patterson*, 975 So. 2d 205, 208 (Miss. 2007), to argue that the trial court denied his right to examine key witnesses and to present his theory of the case. Dewey contends that *Long* "clearly supports" the substantive rights of individual beneficiaries over any procedural rules.

¶24.    In response, Byrd and Independent Roofing contend that the trial court acted within its discretion in allowing all the beneficiaries to participate. Further, they request that this Court consider only the briefs filed by Leah.

¶25.    The attorneys began arguing about their respective roles before completion of opening statements. Following Leah's opening statement, Dewey attempted to give his own opening, and the defendants promptly objected. Citing *Long v. McKinney*, Dewey argued that he had an absolute right to his own attorney. The court allowed Dewey to give an opening statement.

¶26.    However, peace was short-lived when, in the second day of trial, Dewey requested the court's permission to question Byrd after Leah had completed her examination of him. Dewey contended that *Long*'s guarantee of participation was not limited to presenting separate proof of damages; the case also authorized each beneficiary's attorney to question witnesses on liability. Since he had a different trial strategy and a different theory of the

9

case, Dewey argued that allowing only one plaintiffs' lawyer to question each witness would violate his right to participate fully in the trial.

¶27.     After hearing additional arguments, the court determined that both sets of plaintiffs would have an opportunity to participate, although **Long** and **Patterson** did not mandate the extent of that participation.  The trial court reminded the attorneys that, under the wrongful-death statute, the attorney who had first filed the suit owed a duty to all the wrongful-death heirs.  The trial judge stated that, before trial, Leah, Dewey, and their attorneys should have decided their theories of liability and discussed who would ask questions to prove those theories.  Further, the trial judge reasoned that allowing multiple attorneys to question every witness would confuse the jury.  Thus, for the rest of the proceedings, the court instructed Leah and Dewey to cooperate and to work together in presenting their cases on liability.  At the least, the attorneys would present evidence on the individual damages of their respective clients.

¶28.     In **Long,** we held that each beneficiary who so chooses may retain an attorney to represent his or her separate interest and join in the litigation.  **Long**, 897 So. 2d at 174.  We further rejected the notion that the first to file the wrongful-death suit would "'control the litigation' to the exclusion of participation by other heirs who wish to join with other counsel of their choosing." **Id.** at 178.  Finally, we determined that the trial court would maintain broad discretion to decide joinder issues, to manage litigation-control matters, and to determine the participation of separate attorneys. **Id.**

¶29.     We make clear today that each wrongful-death beneficiary has a right to participate fully in all aspects of this trial.  **Long** authorizes each beneficiary's right to separate

10

representation, which includes the inherent right to participate in each part of the litigation. *See Long*, 897 So. 2d at 174. And **Patterson** requires each beneficiary to prove her individual claim for certain damages. *See Patterson*, 975 So. 2d at 208. Here, as in any other case that involves multiple plaintiffs, Dewey had a right to question all the witnesses. The defendants cross-examined Leah on the negative information about Dewey and Kaitlyn in Leah's response to the joinder motion, but Dewey had no opportunity to address the validity of that information. Further, Dewey was denied the right to question Leah, Byrd, and Keys — the only witnesses who were present when the accident occurred. The alleged jury confusion or prejudice from different trial strategies must yield to each wrongful-death beneficiary's right to participate fully in the litigation with her chosen counsel. The trial court committed reversible error in denying Dewey's right to question all the witnesses. *See Patterson*, 975 So. 2d at 208; *Long*, 897 So. 2d at 174.

¶30. When, as here, there are individual claims on liability and damages, our rules of civil procedure must guide the actions of the respective beneficiaries and the trial court. *See, e.g.,* M.R.C.P. 16, 26, 47, 51. And if the circumstances require that the court grant additional peremptory challenges or jury instructions to each beneficiary, the court shall grant the same to the defendants. *See, e.g.,* M.R.C.P. 47, 51. Likewise, our rules of evidence apply with full force during such proceedings. Thus, the concerns on cumulative testimony and jury confusion should be handled through a proper objection. *See* M.R.E. 403. The trial court maintains discretion to control the mode and order of testimony as authorized under Mississippi Rule of Evidence 611. M.R.E. 611. But Rule 611 does not authorize the trial court to deny completely a party's right to question a witness. On remand, the trial court is

11

directed to protect each beneficiary's right to participate in every part of this litigation, subject to the court's need to allow for orderly and rational progress of the trial.

## II.    Jury Instructions

¶31.    Leah and Dewey contend that the trial court improperly refused several proposed instructions that addressed negligence per se, traffic-safety rules, and an alternate theory of the case.

¶32.    Generally, a trial court should grant any requested jury instruction if "it concerns a genuine issue of material fact and there is credible evidence to support the instruction." *Mariner Health Care, Inc. v. Estate of Edwards ex rel. Turner*, 964 So. 2d 1138, 1155 (Miss. 2007).  The trial court may refuse an instruction that incorrectly states the law, that addresses a theory covered in other instructions, or that lacks a foundation in evidence. *Burr v. Miss. Baptist Med. Ctr.*, 909 So. 2d 721, 726 (Miss. 2005).  The denial of an instruction does not warrant reversal unless the appellant demonstrates "that the instructions, taken as a whole, do not fairly present the applicable law." *Mariner Health Care, Inc.*, 964 So. 2d at 1156.

¶33.    Negligence per se renders a defendant liable without proof of reasonable care when the plaintiff proves the defendant violated an applicable statute. *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 796 (Miss. 1995).  In negligence-per-se actions, the party must prove the following:  (1) that the party belongs to the class of people the statute intends to protect, (2) that the party suffered the type injuries the statute was designed to avoid, and (3) that the offender's violation of the statute proximately caused the party's injuries. *Utz v. Running & Rolling Trucking, Inc.*, 32 So. 3d 450, 477 (Miss. 2010);

12

*Thomas v. McDonald*, 667 So. 2d 594, 597 (Miss. 1995). When the statute applies, the court may instruct the jury that the defendant is negligent for violating the statute, but the jury must find that the violation caused or contributed to the party's injury. *Utz*, 32 So. 3d at 477 ("[A] violation of a statute . . . does not dictate that either (1) the violation was the proximate or contributing cause of an injury suffered by a party, or (2) recovery for damages is imminent."). *See also Gallagher Bassett Servs., Inc. v. Jeffcoat*, 887 So. 2d 777, 787 (Miss. 2004).

¶34. Leah and Dewey contend that the trial court improperly denied P-36 and P-44B, which they maintain were based on Mississippi Code Section 63-7-71. *See* Miss. Code Ann. § 63-7-71 (Rev. 2004).[4] Leah and Dewey cite cases that interpret Section 63-7-71 to support

---

[4]Mississippi Code Section 63-7-71 provides, in relevant part:

(1) Whenever any motor truck or bus is stopped upon the highway except for the purpose of picking up or discharging passengers, . . . and such motor truck or bus cannot immediately be removed from the main traveled portion of a highway outside of a business or residence district, the driver or other person in charge of such vehicle shall cause such flares, fusees, reflectors, or other signals to be lighted or otherwise placed in an operating condition and placed upon the highway, one at a distance of approximately one hundred feet to the rear of the vehicle, one approximately one hundred feet in advance of the vehicle and the third upon the roadway side of the vehicle . . . .

(2) Whenever any motor truck or bus is stopped upon the highway except for the purpose of picking up or discharging passengers between the hours of one half hour before sunrise and one half hour after sunset, the driver or person in charge of such vehicle shall place upon the highway in a standing position red flags, one at a distance not less than one hundred feet to the rear of the vehicle and one not less than one hundred feet in advance of the vehicle and the third upon the roadway side of the vehicle . . . .

Miss. Code Ann. § 63-7-71 (Rev. 2004).

their contention that they were entitled to these instructions on negligence per se. *See Thomas*, 667 So. 2d at 597; ***Stong v. Freeman Truck Line, Inc.***, 456 So. 2d 698, 701, 704-05 (Miss. 1984).

*P-36 (warning devices)*

¶35.   Instruction P-36 provided:

> The Court instructs the jury that whenever a truck and trailer combination such as the one in this case is stopped upon the highway at the time of day as in this case, the driver or person in charge of such vehicle shall place upon the highway in a standing position red flags, one at a distance not less than one hundred feet to the rear of the vehicle and one not less than one hundred feet in advance of the vehicle and the third upon the roadway side of the vehicle.
>
> The Court further instructs that the flags in such circumstances should be set out with such reasonable and proper diligence, or promptly under all the facts and circumstances of the case. Consequently, the Court instructs that if you find that either (a) the truck did not contain any flags, or (b) that the truck had flags on board but that Cedric Byrd had not been trained on when and how they should be used, then you shall find the Defendants guilty of negligence and determine causation in accordance with the other instructions.
>
> If however, you find that (a) flags were on board and (b) Byrd had been trained on the proper usage of the flags, but you further find that Byrd did not act with reasonable and proper diligence, or promptly under the facts and circumstances of the case, then you shall find the Defendants guilty of negligence and determine causation in accordance with the other instructions.

¶36.   P-36 contains inconsistent and incorrect statements of the law regarding Section 63-7-71. First, and foremost, Section 63-7-71 does not require that a driver place warning devices *immediately*; rather, he or she must act with "reasonable promptness and diligence under the facts and circumstances of the particular case . . . ." ***Stong***, 456 So. 2d at 710 (Miss. 1984). The jury must decide whether the driver placed the warning devices with reasonable promptness. *Id.* at 710-11. The first paragraph of P-36, which appears to be a statement of

14

the law, made it possible for the jury to impose liability without considering the reasonableness of Byrd's actions under the circumstances. True, the second paragraph begins by stating that the flags should be set out with "reasonable and proper diligence, or promptly" under the facts of the case. But the second sentence of that paragraph directs the jury to find the defendants negligent if the truck did not have flags, or if it had flags but Byrd did not receive training on how they should be used. In other words, flags without training equals negligence — no consideration of reasonableness or proper diligence is required. The final paragraph carries forward the preeminence of Byrd's training. It states that if flags were onboard, and if Byrd had been trained on their use, the jury should impose liability if it finds that Byrd had not acted with reasonable and proper diligence. The problem, once again, is that the reasonableness of Byrd's actions is never reached if the jury finds that he had not been trained. Under P-36, a finding of negligence could very well hinge solely upon whether or not Byrd had received training. The instruction, therefore, was inconsistent, an improper statement of the law, and, arguably, peremptory. *Burr*, 909 So. 2d at 726.

¶37.    *Thomas* does not provide Leah and Dewey any support for the granting of P-36. In *Thomas*, the defendants involved in the accident had admitted that their vehicle lacked any warning devices. *Thomas*, 667 So. 2d at 597. At trial, the plaintiff requested, but the trial court denied, negligence-per-se instructions based on Section 63-7-71. *Id.* at 597-98. On appeal, the Court held that the Section 63-7-71 negligence-per-se instruction should have been given. *Id.* at 597. Since the defendants had admitted that their vehicle lacked any warning devices, they could not argue that they would have complied with *Stong*'s reasonable-promptness standard. *Id.*; *see also Stong*, 456 So. 2d at 710.

15

¶38.    At trial, Byrd and Keys estimated that the trailer had protruded into the road for three to five minutes before the accident happened.   Keys thought that the truck had contained warning devices, but both Byrd and Keys acknowledged that no cones, flags, or other warning devices had been placed in the road.  Because Byrd had stopped for only a short period of time before resuming his turn, he did not see the need to place any warning devices in the road.  McLain added that Independent Roofing trucks had boxes for carrying warning devices, but the devices did not consistently remain in the trucks.

*P-44B (warning devices)*

¶39.    Instruction P-44B stated:

> The Court instructs the jury that the Defendants were negligent as a matter of law in failing to have warning devices available on the vehicle as required.  If you find that this failure was the proximate cause or a proximate contributing cause of the accident, then it shall be your sworn duty to enter a verdict in favor of the Plaintiffs, and you shall assess damages in accordance with the remaining instructions.

P-44B  is improper because it was peremptory and would have held the defendants liable without allowing the jury to consider *Stong*'s reasonable-promptness standard. *See **Thomas***, 667 So. 2d at 597; *Stong*, 456 So. 2d at 710.  In other words, reasonable minds could have differed as to whether Byrd should have placed warning devices in the three-to-five minutes that his trailer was on the road.  While Leah and Dewey were entitled to a properly drafted instruction per *Stong*, P-44B incorrectly stated the law, so the trial court properly refused it. *Burr*, 909 So. 2d at 726.

*P-44A (commercial driver's licenses)*

16

¶40.   Leah and Dewey contend that the trial court improperly denied P-44A, which would have held the defendants negligent as a matter of law because Byrd lacked a commercial driver's license.

¶41.   P-44A stated:

> The Court instructs the jury that the Defendants were negligent as a matter of law in failing to have the required license. If you find that this failure was the proximate cause or a proximate contributing cause of the accident, then it shall be your sworn duty to enter a verdict in favor of the Plaintiffs, and you shall assess damages in accordance with the remaining instructions.

¶42.   Leah and Dewey argue that Byrd acted negligently by failing to execute a proper turn into the driveway or by using the wrong driveway to access the property. They further argue that undisputed trial evidence proved that Byrd needed a Class D license to operate the truck and trailer, and that with the proper license and training, he would not have attempted an unsafe turn.

¶43.   Leah and Dewey refer to different commercial driver's license statutes to support their positions. Leah points to Section 63-1-211 as authority. *See* Miss. Code Ann. § 63-1-211 (Supp. 2010) (commercial driver's licenses, generally). Dewey cites Sections 63-1-74, 63-1-77, and 63-1-82. *See* Miss. Code Ann. §§ 63-1-74 (purpose of commercial driver's license statutes), 63-1-77 (requirement to have commercial driver's license, generally), 63-1-82 (commercial driver's licenses, generally) (Rev. 2004) (all three statutes repealed 2009).

¶44.   At trial, McLain testified that his boss had instructed him to have Byrd pick up the equipment from Smith's house on the day of the accident. Out of concern, McLain had verified the request with Independent Roofing safety director Russell Ramsey. McLain knew

17

the trip to Smith's home would have been difficult for an experienced driver, and he also thought that Byrd had been unfamiliar with loading equipment.

¶45. Ramsey testified that he did not recall authorizing Byrd to pick up the equipment. Ramsey had known that Byrd did not have a commercial driver's license, and that he had not been trained to drive trucks. Ramsey testified that he thought that Byrd would have needed a Class D license to drive the truck and trailer. He explained that the Class D license would have required a written test, rather than a skills tests.

¶46. Byrd acknowledged that he lacked a commercial driver's license. And while he was experienced in driving eighteen-wheelers, Independent Roofing had not trained him to drive the truck and trailer he had used to haul Independent Roofing's materials.

¶47. Smith held a Class A commercial driver's license at the time of the accident, which he testified would have covered the truck and trailer that Byrd had driven. Smith had taken the piece of equipment to his home using the same truck and trailer driven by Byrd, but he had used an alternate gravel road nearby to access his property.

¶48. Here, the cited commercial driver's license statutes do not apply. The accident occurred on September 29, 2003, and the effective date of Section 63-1-211 was July 1, 2009. Miss. Code Ann. § 63-1-211 (Supp. 2010). *See **City of Starkville v. 4-County Elec. Power Ass'n***, 909 So. 2d 1094, 1109 (Miss. 2005) (noting that statutes do not apply retroactively absent a clear statement from the Legislature). Further, Leah and Dewey failed to show that the Legislature had enacted Sections 63-1-74, 63-1-77, or 63-1-82 to address the type of harm that occurred in this case. Most importantly, the plaintiffs failed to prove a connection between the injury and Byrd's lack of a particular license. Therefore, the trial

18

judge properly refused instruction P-44A. *Gallagher Bassett Servs., Inc.*, 887 So. 2d at 787; *Burr*, 909 So. 2d at 726. *See also Utz*, 32 So. 3d at 477.

*P-40 (safe turns)*

¶49. Leah and Dewey contend that the court should have granted P-40, which addressed a driver's responsibility to execute safe turns from the roadway.

¶50. P-40 stated:

> The Court instructs the jury that if you find that a reasonably prudent person would not have attempted to maneuver the type of flat bed truck and 29 foot gooseneck trailer as that used by the Defendants from a highway into a narrow, private drive of the dimension and character as the one in this case, in the manner employed by the Defendants, then you shall find that the Defendants were negligent. If the jury so finds, then you shall then decide whether such negligence proximately caused or contributed to the accident and death of Jonathan Dooley, and shall do so in conjunction with the remaining instructions given.

¶51. Here, Leah and Dewey requested, and the trial court granted, another instruction that covered a driver's responsibility to turn safely. Jury instruction number 13[5] instructed the jury to return a verdict in the plaintiffs' favor if it found that Jonathan's death was caused by Byrd's failure in attempting to turn from a direct course on the highway into Smith's driveway, when the turn could not be done or was not done with reasonable safety. Thus,

---

[5]Jury instruction number 13 stated:

> The Court instructs the jury that no person shall turn from a direct course upon the highway unless and until they may do so with reasonable safety.

> If you find from a preponderance of the evidence that Cedric Byrd did not act with reasonable safety in making the turn, and that such failure was the proximate cause or a proximate contributing cause of the death of Jonathan Wayne Dooley, then you shall find in favor of the Plaintiffs.

19

the trial court properly refused P-40, as it would have been cumulative. ***Burr***, 909 So. 2d at 726.

*P-21 (alternate theory)*

¶52. Dewey contends that the trial court improperly denied P-21,[6] which imposed liability if Byrd negligently had allowed his vehicle to "stop in a lane of travel on the highway when it was possible or reasonably practicable for him to steer his vehicle down the driveway and out of the highway . . . ." Dewey argues that refusing the instruction prohibited the jury from hearing this alternate theory of the case.

¶53. Neither the transcript nor the record shows where the court refused P-21. The copy provided by Dewey does not indicate that the instruction was offered or that the court refused the instruction. The record is otherwise silent as to whether the instruction was even

---

[6]P-21 stated:

The Court instructs the jury that according to Mississippi law no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main traveled part of any highway, unless it is impossible to avoid stopping in the roadway.

Therefore, if you find from a preponderance of the evidence in this case that Cedric Byrd allowed his truck and trailer to stop in a lane of travel on the highway when it was possible or reasonably practicable for him to steer his vehicle down the driveway and out of the highway, then the Court instructs the jury that such act constitutes negligence on behalf of the Defendant, Cedric Byrd, and if you find from a preponderance of the evidence that such negligence was the sole proximate cause of the accident, injuries, and death of Jonathan Dooley, Deceased, then it is your sworn duty to return a verdict for the Plaintiffs and against the Defendants, Independent Roofing Systems [and] Cedric Byrd.

considered by the trial court. Thus, the Court has no duty to address his contention. M.R.A.P. 28.

*Jury Instruction Number 7 (car-safety seat)*

¶54. Dewey asserts that the trial court erred in granting the "instruction regarding the car safety seat . . . ." Dewey contends that the instruction excused Byrd and Independent Roofing's negligent actions because it authorized the jury to consider that Jonathan had gotten out of his car seat for "other purposes under Mississippi law . . . ."

¶55. We assume that Dewey refers to Byrd and Independent Roofing's proposed car-seat instruction, D-22, which the trial court ultimately denied. In fact, the trial court granted the plaintiffs' requested car-safety-seat instruction, P-20A. Jury instruction number 7 (P-20A) specifically stated that the jury could not consider whether Jonathan was buckled in his car seat as evidence of contributory negligence on behalf of Leah or Jonathan. Because Dewey is mistaken about the instruction the jury received, his claim lacks merit. ***Mariner Health Care, Inc.***, 964 So. 2d at 1156.

*Jury Instruction Numbers 10 and 11 (shadows and driveway)*

¶56. Leah and Dewey challenge the trial court's grant of jury instruction numbers 10 and 11, which prohibited the jury from apportioning fault for the dark shadows along the roadway or the alleged narrow and steep condition of Smith's driveway.

¶57. Jury instruction number 10 stated:

> If you find from a preponderance of the evidence that the condition of the driveway contributed to the accident then such contribution is not attributable to any party in this case.

21

¶58. Jury instruction number 11 stated:

> If you find from a preponderance of the evidence that the condition of the shadows contributed to the accident, then such contribution is not attributable to any party in this case.

At trial, Leah and Dewey argued that both were vague and would confuse the jury. On appeal, they add that the shadows and the driveway should have been considered by the jury. Leah and Dewey imply that the fault for both should be apportioned to Byrd and Independent Roofing.

¶59. Issues regarding shadows or the driveway are factual considerations that should have been available to the jury. Because jury instructions numbers 10 and 11 improperly removed fact issues from the jury's consideration, the trial court erred in granting both instructions. *Mariner Health Care, Inc.*, 964 So. 2d at 1156.

## CONCLUSION

¶60. Because the wrongful-death beneficiaries were not allowed to fully participate in this wrongful-death action, and because the jury was not properly instructed, we reverse the trial court's judgment in Byrd and Independent Roofing's favor, and remand this case to the trial court for further proceedings consistent with this opinion.

¶61. **REVERSED AND REMANDED.**

**CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS AND KING, JJ., NOT PARTICIPATING.**